2023 IL App (2d) 220071-U
No. 2-22-0071
Order filed February 15, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 10-CF-419 |
| JESUS LECHUGA, | ) ) ) | Honorable Alice C. Tracy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE KENNEDY delivered the judgment of the court.
Justices Jorgensen and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  There was sufficient evidence to prove defendant guilty beyond a reasonable doubt of first-degree murder. The trial court's failure to fully comply with *Zehr* did not result in reversible error because the evidence at trial was not closely balanced. Defendant failed to show plain error or ineffective assistance of counsel as a result of the prosecutor's alleged improper comments during closing argument. Therefore, we affirm.

¶ 2    Following a jury trial, defendant, Jesus Lechuga, was convicted of first-degree murder (720 ILCS 5/9-1 (West 2004)) and sentenced to 55 years' imprisonment. On appeal, he argues that (1) he was not proven guilty beyond a reasonable doubt; (2) he is entitled to a new trial because the trial court failed to question four potential jurors on the fourth *Zehr* principle, and the trial evidence

was closely balanced; and (3) the prosecution made improper comments during closing argument. We affirm.

¶ 3                                 I.  BACKGROUND

¶ 4     On February 17, 2010, defendant was charged by indictment with two counts of first-degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2004)) for allegedly shooting Jose Covarrubias in the head on March 1, 2004.

¶ 5     Due to issues with discovery, pretrial litigation, and securing the presence of witnesses, defendant's jury trial began many years later, on July 12, 2021. Sergeant Jorge Gonzalez of the Carpentersville Police Department was accepted as an expert in street gangs and gang member identification. He testified that in 2004, four gangs were the most active in Carpentersville: the Latin Kings, Maniac Latin Disciples, Vice Lords, and Gangster Disciples. The Latin Kings and the Maniac Latin Disciples were in a "constant battle *** over anything from the drug trade to territory and recruitment." Gonzalez testified that the gangs did not necessarily need a specific reason to shoot each other, but they tended to do so out of retaliation. According to Gonzalez, the Maniac Latin Disciples used the initials MLD and certain symbols, including a pitchfork.

¶ 6     Margarita Covarrubias, the victim's sister, provided the following testimony. On February 29, 2004, she lived at 948 Chippewa Circle in Carpentersville, which was located near a White Hen Pantry. Margarita lived in the house with various relatives, including her brother, who was 23 years old. Jose was part of the Maniac Latin Disciples gang and had the nickname "Buddha." Jose had a dog that slept with him, and Jose's friends would often come to his bedroom window. She did not know if he sold drugs. On the day in question, Jose was hanging out with his friends in the house. Later, at about 11:45 p.m., Margarita was getting ready for bed and Jose was going in and out of his bedroom, which was next to her room. Margarita could not remember all of the details

of that night because she subsequently had a brain lesion that affected her memory. Margarita remembered that when she was in bed, she heard a male come up to Jose's window and say one sentence, and then there was a loud noise. She ran to Jose's room and saw that he had a gunshot wound to the head. Margarita called an ambulance and gave Jose CPR.

¶ 7    Officer Jeff Elliot testified that he was dispatched to the scene and arrived around 12:11 a.m. It was "hectic" at the house with relatives "running around" and "not knowing what to do." He saw Jose lying on his back with a pool of blood underneath him, with possible brain matter in the blood. Jose had a bullet wound near his left eye, and his feet were towards a bedroom window that was broken and had a bullet hole through the frame. The blinds on the window were raised up. The bedroom had an entertainment center with a television, but Elliot did not recall whether he heard the television. When the paramedics wheeled Jose out of the room, Elliot heard a gurgle and what seemed to be a last gasp of air. Elliot secured the bedroom with crime scene tape. Before Elliot left, approximately 10 more friends and family came to the house.

¶ 8    According to additional evidence presented by the State, there were two windows outside of Jose's bedroom, on the side of the house, about 4 to 4½ feet off the ground. One of the windows had broken glass and a bullet hole in the frame. Both windows had footwear impressions and empty beer bottles, bottle caps, and cigarette butts underneath. Cigarette butts and bottle caps were sent to the crime lab, but there were no results. The police did not locate any shell casings in the backyard or surrounding areas, but some firearms, like revolvers, do not eject shell casings. A photograph of Jose's bedroom taken by an officer dispatched to the scene showed the television turned on. A backpack with two firearms was on Jose's bed. There were no latent fingerprints suitable for comparison on the broken window. Two bullet fragments were removed from Jose's head, which came from either a .38 or .357 caliber gun. This information was not released to the

public. According to a firearms expert, it was possible to fire a .38 caliber bullet from a .357 caliber gun, but most .38 caliber guns could not fire .357 bullets. Jose had tattoos of a pitchfork and the letters MLD on his chest.

¶ 9    On March 11, 2004, Detective Tim Bosshart and other officers went to execute a search warrant on defendant's residence. As Bosshart went to take a position at the back of the home, an officer radioed that someone was running out the back door. Bosshart ran to the back, and defendant stopped and put his hands up. Defendant was wearing only one slipper. He did not have a weapon on him, and no .357 gun or ammunition was found in the house.

¶ 10    Later that day, Gonzalez and and Detective John Galason interviewed defendant at the Carpentersville Police Department. Defendant admitted to being an active Latin King gang member and to owning a "three-five" pistol, which Galason took to mean a .357 revolver handgun. Defendant said he had it "tucked" in his waistband that day and "pitched it" after running out the back door. Defendant said he had the gun for a few months, including the night Jose was shot, but would not say where he got the gun.

¶ 11    James Martin provided the following testimony. He met defendant through defendant's brother, Gilberto, who used to sell Martin marijuana. Martin was "associated" with the Latin Kings, but defendant was a "member" and went by the nicknames Jesse and Cypress. During the evening of the shooting, Martin was at the Lechuga residence where defendant and Gilberto lived with their parents. Martin was there with his girlfriend, Renee Gutierrez, and was drinking and using cocaine and marijuana. Martin was a cocaine addict at the time but could remember most conversations. Defendant was near the garage area with his friends. Defendant left and came back an hour later, "pretty like hyped up or like shaken," and said that everyone had to leave. He had a big chrome pistol with a wood or black handle on his belt. Martin had seen defendant with the gun

in his possession more than once in the prior year. Defendant referred to the gun as "Clint Eastwood or Dirty Harry" because it was big and "like a gun used in the movies." Martin "was not a gun person" and did not know the gun's caliber but believed that it was a .357. Martin testified on cross-examination that he did not remember if he saw defendant leave the house and did not know with whom defendant left.

¶ 12    In November 2004, Martin became better friends with defendant. When they were at the Lechuga residence in late 2004 or early 2005, defendant told Martin that he had gone to Jose's house, knocked on the window, and when Jose looked through the window, defendant shot Jose with Dirty Harry. Defendant subsequently said more than five times in Martin's presence that he had shot Jose. Martin agreed that he testified in front of the grand jury that there were as many as eight conversations. The conversations occurred in and around defendant's house, in a car, and at Martin's ex-wife's house. Defendant said that Jose lived behind the White Hen in Carpentersville. He said in conversations that he shot Jose in the head, shot him in the face, and "[b]lew his head off" because of a "general dispute" between the rival gangs. Defendant's demeanor during the conversations ranged from boasting to sad.

¶ 13    The first time Martin came forward to the police with the information was in April 2005, when Martin was in jail. Martin was later equipped with a wire to get a recorded conversation with defendant admitting that he shot Jose, but Martin was not able to. Martin had received some benefits from the Carpentersville Police Department and the Kane County State's Attorney's Office, in that he was not charged with possessing one gram of cannabis, and outstanding fines and fees were cleared.

¶ 14    Gutierrez, Martin's former girlfriend, testified that he often lied when they were dating.

¶ 15    Richard Olvera testified as follows. He was a founding member of the Carpentersville Latin Kings. Defendant became a Latin King around 1997. In 2004, the Maniac Latin Disciples were rivals of the Latin Kings. Olvera heard about Jose's death but did not recall discussing it with defendant. He acknowledged testifying in front of the grand jury on June 15, 2007, and his recollection was refreshed with the transcript. About one week after the shooting, defendant said that he and Jason Yates decided to "go for a ride" and "look for problems behind the White Hen." They drove by Jose's house and saw a light on in Jose's room. Yates parked further down the street. Defendant went to Jose's window and knocked on it, and when Jose came to the window, defendant shot him once in the head with a .357 gun. He then "took off running" to the car. Defendant told Olvera in at least 10 conversations that he shot Jose. Olvera admitted that from 2004 to 2007, Olvera was a drug addict and used at least 1.5 grams of cocaine per day, which impacted his memory.

¶ 16    Olvera further admitted to testifying to the following in front of the grand jury. He and defendant were always drinking and doing drugs during their conversations. Defendant had previously walked around the neighborhood behind White Hen with a gun to "look for problems," and "plan his escape routes if he was going to do anything." Sometime after admitting to shooting Jose, defendant told Olvera that the police had searched his house, and he still had the murder weapon there. He said that he had hidden it under a piece of wood in his backyard and that the police did not find it.

¶ 17    Olvera agreed that he did not tell anyone about the conversations until 2007. In late April 2007, he was arrested on federal charges for a major drug conspiracy. At the federal building, he met with either Gonzalez or Detective Todd Shaver and agreed to testify against defendant. He was then released from federal custody. Olvera faced federal charges that could result in up to 40

years' imprisonment. Shaver picked Olvera up from his house and drove him to the courthouse to testify in front of the grand jury. The ride was about 40 to 45 minutes, and they talked about the case. Shaver "refresh[ed] [Olvera's] memory of what was going on." After providing the grand jury testimony, Olvera was sentenced to 27 or 28 months' imprisonment and got out in less than two years because he participated in drug treatment. Also, Olvera was on probation in Kane County when he faced federal charges, and as a result of his cooperation, the probation violation was dismissed.

¶ 18    At trial, Olvera testified that he did not recall defendant telling him that he shot Jose. Olvera heard most of what he testified to in front of the grand jury from hanging out with gang members. Olvera used the information to his benefit so he would not have to spend 40 years in prison. He never saw defendant with a gun. After defendant was charged in 2010, Olvera received a final payment of $500 from the federal government to relocate his family. Olvera denied that he received the money because of death threats from the Latin Kings.

¶ 19    The parties stipulated that the FBI paid Olvera $3500 so that he could relocate his family based upon threats he allegedly received.

¶ 20    Liria Torres testified that in March 2004, she was about 18 years old and lived in a house in Carpentersville with her older brother, Antonio Torres, who was in his 20s at the time. He was a Latin King and went by the nickname "Goofy." She "vaguely" remembered testifying in front of the grand jury that Antonio was the "Inca" of the gang. She recalled previously testifying that Antonio had a police scanner and would listen to it every day, especially at night. Liria denied knowing a person named "Buddha." She knew Margarita Covarrubias because Margarita had a child with one of Liria's brothers. Liria knew defendant for many years from her brother and other friends, and she believed that he was a Latin King.

¶ 21    Liria did not recall testifying to the following in front of the grand jury. Around midnight on March 1, 2004, there was a loud knock at the door, and Liria went to answer it. Defendant and another man went up to Antonio's room, and they talked about what Antonio had heard on the police scanner. The men were comfortable with Liria's presence in the room because of her relationship to Antonio. Defendant said that he had walked around Jose's house, went to Jose's window, and got the dog's attention. Jose was watching a Britney Spears music video on television and went to the window to see what the dog was doing. Liria did not remember if defendant said he shot Jose in the head, or if she heard that on the police scanner. She did not see defendant with a gun that night. Defendant and his associate left the house after the conversation, which lasted about five minutes.

¶ 22    Liria testified that she was arrested on November 1, 2006, in relation to a federal drug conspiracy and faced charges of 10 years to life imprisonment. Olvera, Antonio, and Christina Corbin were charged with related activity. Liria had a 10-month-old daughter at the time. Her grand jury testimony was not true, but rather she was trying to help herself. Liria entered a plea in which she was sentenced to 42 months, though she ultimately received a sentence reduction because she was a drug addict and participated in a drug program.

¶ 23    Corbin testified that she got to know defendant through another Latin King gang member in the summer of 2002. She had seen him only at parties and was not friends with him. She later met Antonio and started dating him in the spring of 2005. Antonio was an "Inca" or leader in the Latin Kings. He would sometimes talk about gang members in front of Corbin. She knew "Buddha"/Jose because she used to live by him and had hung out with him a few times. In April or May 2005, she was in Antonio's bedroom with Antonio, her sister, and others when defendant entered. Antonio and defendant had a conversation in which defendant said that he had lifted Jose's

window, knocked on it because he knew that Jose was a drug dealer, and then shot Jose. Defendant said that something had happened, that he was in a hurry, and that he had to change and leave. Defendant took off a black hoody and changed into one of Antonio's t-shirts. Corbin acknowledged that defendant and Antonio were not the same size and that the conversation happened over one year after Jose's death.

¶ 24    Corbin did not tell anyone about the conversation until 2007, after she had been arrested in relation to a federal drug conspiracy and was facing a sentence of up to 25 years for "conspiracy with intent to sell 5 to 15 keys of cocaine." Corbin was "looking for a benefit" and testified against defendant. She never saw defendant with a gun and had never had a conversation with him. Corbin was not a gang member but knew that gangs had a code of silence, which meant not speaking about anything that happened, including murder.

¶ 25    Wayne Wilson provided the following testimony. In March 2004, he lived in Carpentersville and had been friends with Antonio for a couple of years. They would hang out at Antonio's house every day doing drugs and drinking alcohol, which made Wilson's memory from the time "very hazy." Antonio was Wilson's drug supplier, and Antonio's house was a "drug house." Wilson had heard about what had happened to Jose, who he believed was a Maniac Latin Disciple, but did not know him. Wilson remembered Antonio talking about Jose more than any other of his friends.

¶ 26    Wilson acknowledged testifying in front of the grand jury on June 15, 2007, that a few days after the shooting, he was at Antonio's house. Defendant later arrived and started talking to Antonio. Defendant said that he tapped on Jose's window, and when Jose came up, he shot him using a "Coonan .357."

¶ 27    In June 2007, Detective Shaver approached Wilson while he was in jail. Wilson testified in front of the grand jury because he was pressured to and felt that he had no choice. Defendant did not tell Wilson that he shot anyone, but rather Wilson heard Antonio talk about it with other people at his house. Wilson did not know what a "Coonan" was but believed that he heard people talk about a "canon." Wilson testified that he did not lie to the grand jury but rather believed that what he heard was the truth, but now that he was "clear headed" he "honestly [did not] know what happened."

¶ 28    Detective Shaver testified as follows. Martin admitted to being a Latin King gang member. He obtained an authorization for an eavesdrop device for Martin, but Martin never wore the device because "any attempts to get Mr. Martin with [defendant] did not occur." Shaver spoke to Martin on April 7, 2005, but Martin gave him "different" information on November 22, 2006.[1]

¶ 29    Shaver was dispatched to the scene after the shooting, and Jose's family gave him the names of possible suspects. Shaver spoke to Jose's ex-girlfriend Christina Kamp, her brother Christopher Kamp, who became a possible suspect, and Jose's friend Eric Sanchez. Christina's boyfriend Joseph Czarney also became a suspect, and clothes belonging to him were tested for gunshot residue and blood. Other suspects included "Sabo," Fernando Rodriguez, and someone with the last name Yates. Shaver called Yates, who was out of state, but did not pursue him further. Shaver ruled out everyone as a suspect other than defendant.

¶ 30    During deliberations, the jury sent a note with six questions: what defendant's height was, why so much time elapsed between the grand jury and the trial; when and why did defendant

---

[1]The trial court did not allow questioning about how the information was different, because such a question would be beyond the scope of the direct examination.

become a suspect; whether defendant's footprint was compared to those at the crime scene, and what was the probable cause for the search warrant. The parties agreed with the trial court's response that the jury was to render its verdict based on the evidence and instructions it already received.

¶ 31    The jury found defendant guilty of first-degree murder. It further found that defendant personally discharged a firearm that caused the death of another person.

¶ 32    Defendant filed a motion for a new trial on August 16, 2021, which the trial court denied on March 2, 2022. The following day, it sentenced defendant to 30 years' imprisonment for first-degree murder, plus another 25 years' imprisonment for personally discharging a firearm in the commission of the murder. Defendant timely appealed.

¶ 33                                    II. ANALYSIS

¶ 34                            A. Sufficiency of the Evidence

¶ 35    Defendant first argues that there was insufficient evidence to prove him guilty beyond a reasonable doubt of Jose's murder. When examining the sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The trier of fact has the responsibility to assess witnesses' credibility, weigh their testimony, resolve inconsistencies and conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). We will not reverse a criminal conviction based on insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Murray*, 2019 IL 123289, ¶ 19.

¶ 36    Defendant highlights that there was no physical evidence linking him to the crime and argues that the only evidence implicating him was the testimony of the State's witnesses, all of whom had a motive to falsely implicate him because they were in police custody when they came forward and received benefits from cooperating with authorities.

¶ 37    Defendant argues that Martin was the most untrustworthy witness due to his history of lying. He notes that Martin initially testified that he saw defendant leave the house but then testified that he did not recall whether he saw defendant leave. Defendant maintains that it was also contrary for Martin to say that he was unfamiliar with guns but then claim that defendant had a .357 revolver, and that Martin also lied to Shaver about being a Latin King to bolster his credibility. Defendant further contends that Martin was an unreliable witness because he was a drug addict (see *People v. Rivera*, 2011 IL App (2d) 091060, ¶ 38 (testimony of habitual drug users is subject to suspicion because they are notorious liars)), did not implicate defendant until Martin was in jail in 2005, and gave different stories to Shaver. Defendant asserts that Martin's agreement to wear an eavesdropping device further decreased his credibility (see *Lee v. United States*, 343 U.S. 747, 757 (1952) (use of "false friends" or "any of the other betrayals which are 'dirty business' may raise serious questions of credibility")), and even then, he could not get a recorded conversation. Defendant maintains that Martin admitted to continuing to receive benefits from the police and the State's Attorney's office, which gave him an incentive to continue to falsely accuse defendant. See *People v. Williams*, 65 Ill. 2d 258, 267 (1976) ("we have held that when it appears that a witness has hopes of a reward from the prosecution, his testimony should not be accepted unless it carries with it an absolute conviction of its truth").

¶ 38    Defendant argues that Olvera was a founding member of the Carpentersville Latin Kings and a drug addict, and though he was impeached with his grand jury testimony about what

defendant allegedly told him, the testimony was based on conversations Olvera had with other people rather than with defendant himself. Defendant argues that the testimony that defendant saw Jose's bedroom light on was not even consistent with the house's layout, as Jose's window was in the rear of the house and not in street view. Defendant contends that Olvera's grand jury testimony was further undermined because Shaver "refresh[ed]" Olvera's memory about the case on the drive to the courthouse and because Olvera used rumors he heard to get a benefit in his federal case, a dismissal of his probation violation charge in Kane County, and a payment of $3500 from the FBI to relocate.

¶ 39    Regarding Liria, defendant argues that she was similarly facing significant federal drug charges. Defendant points to Liria's testimony that she testified in front of the grand jury to protect herself and minimize her sentence. Defendant notes that Liria recanted her grand jury testimony. He argues that her recantation is supported by the fact that her grand jury testimony also did not match the crime scene, in that she had testified that defendant used Jose's dog to lure him to the bedroom window, but none of the officers who went to the scene testified that there was a dog present or paw prints in the blood. Defendant argues that the fact that the television was on in the bedroom when the police arrived does not necessarily corroborate that Jose was watching Britney Spears when he was shot.

¶ 40    Defendant argues that Corbin's testimony suffered from similar weaknesses. He notes that she testified that the conversation she heard occurred over one year after the shooting in both her and her sister's presence. Defendant points out that Corbin came forward after she faced federal drug conspiracy charges, and she admitted that she was looking for a benefit in exchange for information against defendant. Defendant maintains that neither Corbin, Liria, nor Olvera ever saw him with a gun or had a direct conversation with him about the shooting.

¶ 41    Defendant argues that Wilson was also incredible, in that his grand jury testimony was based on rumors he had heard while drinking and doing drugs. Defendant notes that Wilson testified at trial that he felt pressured to testify in front of the grand jury, and that defendant never told him that he shot anyone.

¶ 42    Defendant argues that a detailed review of the evidence shows that the State's case was based on fabrications and street rumors originating from Antonio's "drug house," rather than facts. Defendant argues that the State attempted to bolster the witnesses' credibility by asserting that they knew details about the shooting that only the offender would know, but that the assumption is undermined by two crucial facts. First, despite the State's conclusion that the murder weapon was fired by a .357 caliber gun, the evidence showed that the bullet fragments were discharged from either a .38 or .357 caliber gun. Second, the shooting's details were common knowledge as Antonio possessed a police scanner, the majority of witnesses were connected to Antonio, and news of the shooting spread around his "drug house." Also, Jose's family knew certain details about the shooting, and both Corbin and Liria had connections to his family. Further, many civilians arrived at Jose's house immediately after the shooting to console the family.

¶ 43    Defendant argues that the State failed to prove that he, and not someone else, committed the offense beyond a reasonable doubt. Defendant argues that the evidence showed that Jose was speaking to someone through the window prior to being shot, which is consistent with testimony and photographs. Defendant argues that considering testimony that Jose's friends would often come to his bedroom window, the evidence strongly suggests that the offender was someone Jose was familiar with rather than a rival gang member. Defendant argues that given the circumstances of multiple active suspects, no eyewitnesses, no forensic evidence, and untrustworthy witnesses

who came forward only after their own freedom was in jeopardy, no reasonable trier of fact could have found him guilty beyond a reasonable doubt.

¶ 44    We note that defendant contests only the identity element of the crime and not any other elements of first-degree murder. We conclude that, viewing the evidence in the light most favorable to the State, there was sufficient evidence that defendant was the shooter to prove him guilty of the murder beyond a reasonable doubt.

¶ 45    Martin testified that he first became friends with defendant's brother and then became friends with defendant. Martin testified to being at defendant's residence with others the night of the shooting, when defendant came back "pretty like hyped up or like shaken" and said that everyone had to leave. Defendant had a big chrome pistol on his belt that Martin had previously seen in defendant's possession, and Martin believed that it was a .357 caliber gun. Martin testified that in late 2004 or early 2005, defendant told him more than five times that he went to Jose's house, knocked on the window, and when Jose looked through the window, defendant shot him with the gun. Martin acknowledged testifying in front of the grand jury that defendant admitted shooting Jose in as many as eight conversations. Defendant said that he shot Jose in the head, shot him in the face, and "[b]lew his head off" because of a "general dispute" between the rival gangs. The evidence was clear that defendant was a member of the Latin Kings gang while Jose was a member of the Maniac Latin Disciples, and that the gangs were enemies. Martin testified that defendant's demeanor during the conversations ranged from boasting to sad.

¶ 46    Olvera testified to being a founding member of the Carpentersville Latin Kings. Olvera testified in front of the grand jury that about a week after the shooting, defendant told Olvera that he and Yates decided to "go for a ride" and "look for problems behind the White Hen." They stopped after seeing a light in Jose's room, and defendant went to Jose's window, knocked on it,

and when Jose came to the window, defendant shot him once in the head with a .357 gun. Defendant then ran to the car. Olvera testified in front of the grand jury that defendant told him that he shot Jose in at least 10 conversations. Defendant also told Olvera that defendant still had the murder weapon when the police searched his house, but he had hidden it under a piece of wood in his backyard, and the police did not find it.

¶ 47    Liria testified that she was Antonio's sister, and she recalled previously testifying that he listened to a police scanner every day. Liria testified in front of the grand jury that defendant and another man came to the house on March 1, 2004, at around midnight. Antonio had heard about the shooting on the police scanner, and defendant said that he had walked over to Jose's window and gotten the attention of Jose's dog. Jose was watching Britney Spears on television and went to the window to see what was happening. Liria testified to the grand jury that she did not remember if defendant said that he shot Jose in the head or if she heard this information on the police scanner. Defendant and the other man then left the house.

¶ 48    Corbin testified that she was dating Antonio, who was a Latin Kings leader. In April or May 2005, defendant had a conversation with Antonio in the presence of Corbin and others. He said that he had lifted Jose's window, knocked on it because he knew that Jose was a drug dealer, and then shot Jose.

¶ 49    Wilson testified that he was friends with Antonio and would hang out with him every day at Antonio's house. Wilson testified in front of the grand jury that a few days after the shooting, he was at Antonio's house when defendant came over and said to Antonio in a conversation that he tapped on Jose's window, and when Jose came to the window, defendant shot him using a .357 caliber gun.

¶ 50　　Therefore, five witnesses testified at one point to participating in or overhearing about 21 or more conversations in which defendant admitted shooting Jose. Though the majority of these witnesses testified to a lack of recollection at trial, they were impeached with their grand jury testimony about the conversations in which defendant described firing a gun at Jose. In such circumstances, their grand jury testimony was admissible as substantive evidence. See 725 ILCS 5/115-10.1 (West 2022); *People v. Wesley*, 2019 IL App (1st) 170442, ¶¶ 22-25.

¶ 51　　All of the descriptions of the shooting were largely consistent, with defendant knocking on Jose's window to get his attention and then shooting him once in the face/head with a .357 caliber gun when Jose came to the window. This account also matches the crime scene, in which Jose was found in his bedroom with a single bullet wound to the face, with his feet towards his window, and the window was cracked and had a bullet hole through the frame. Liria, who testified in front of the grand jury to hearing defendant's admission the night of the shooting, provided additional details, such as that defendant got the dog's attention, which was consistent with Margarita's testimony that Jose had a dog that slept with him, and that Jose was watching television at the time, which was consistent with the crime scene photo showing the television on. The dog may have left the room immediately before or after the shooting, which would explain why there were no paw prints in the blood. Regarding whether the light from Jose's room would have been visible from the street, the jury was able to hear testimony and see photos about the home's layout and make its own assessment. Further, the trier of fact is not required to be satisfied beyond a reasonable doubt as to each link in the chain of circumstances if all of the evidence together satisfies the trier of fact of the defendant's guilt beyond a reasonable doubt. *People v. Galarza*, 2023 IL 127678, ¶ 27. The use of a .357 caliber gun is consistent with Galason's testimony that defendant admitted to owning such a gun on the night of the shooting, and with the evidence that the bullet fragments

removed from Jose's head came from either a .38 or .357 caliber gun. Defendant further attempted to flee from the police when they were about to search his house, which was evidence of consciousness of guilt. See *People v. Jackson*, 2019 IL App (1st) 161745, ¶ 30 (the defendant's attempt to flee indicated consciousness of guilt).

¶ 52    Defendant's argument is largely an attack on the witnesses' credibility. It is true that all of the State's witnesses came forward only after they had been arrested for other crimes and that they all obtained concessions from testifying against defendant in front of the grand jury. The witnesses further had drug addictions. Defendant also correctly notes that Liria recanted her testimony at trial and that all of the witnesses other than Martin and Corbin testified that they did not remember or never heard defendant saying that he shot Jose. However, the witnesses may not have come forward initially due to the "code of silence" Corbin described, but then determined after being arrested that they valued their individual freedom more. After obtaining the benefits from their grand jury testimony, they may have been reluctant to testify at trial because they had nothing further to personally gain and had all been friends or associated with defendant, or because they feared retaliation, as evidenced by the FBI providing money to Olvera to relocate his family based on alleged threats.

¶ 53    In the end, the jury was fully apprised through cross-examination of the witnesses' involvement with drugs and the benefits that they received from authorities for their testimony against defendant. It is the jury's function as the trier of fact to assess witnesses' credibility and to resolve discrepancies and inconsistencies in the evidence. *People v. Jackson*, 2020 IL 124112, ¶ 66. Moreover, the trier of fact may accept or reject all or part of a witness's testimony. *People v. Logan*, 352 Ill. App. 3d 73, 81 (2004). Based on the verdict, the jury determined that the witnesses' grand jury testimony was more credible than their trial testimony, in light of all of the evidence

presented at trial. See *id.* at 80 (jury could find the witness's pretrial statement and grand jury testimony more credible than her trial testimony, and the appellate court would not substitute its judgment for that of the trier of fact). The evidence implicating defendant as the shooter was not so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of defendant's guilt.

¶ 54                                    B. *Zehr* Principles

¶ 55     Defendant next argues that he is entitled to a new trial because the trial court violated Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) in questioning part of the venire. Rule 431(b) codifies *People v. Zehr*, 103 Ill. 2d 472, 477 (1984), and requires that the trial court ask each potential juror, individually or in a group, whether he or she understands and accepts the following four principles: (1) the defendant is presumed innocent of the charges; (2) the State must prove the defendant's guilt beyond a reasonable doubt; (3) the defendant is not required to present any evidence in his defense; and (4) the defendant's failure to testify may not be held against him. Ill. S. Ct. R. 431(b) (eff. July 1, 2012). Rule 431(b) requires questioning on whether the potential jurors both understand and accept each of the enumerated principles. *People v. Thompson*, 238 Ill. 2d 598, 607 (2010).

¶ 56     Defendant argues that although the trial court informed the venire of all of the principles, it failed to ask a panel of four jurors, including three jurors who were accepted on the jury, about the fourth principle, which was particularly relevant here because he did not testify. Defendant recognizes that he forfeited this argument by not objecting at trial or raising the issue in a posttrial motion, but he asks that we review the issue under plain error. Plain error occurs where either (1) a clear error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, or (2) a clear error occurs that is so serious that it affected

the fairness of the trial and challenged the integrity of the judicial process. *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007). Absent evidence that a Rule 431(b) violation produced a biased jury, which defendant does not allege, a Rule 431(b) violation is not cognizable under the second prong of the plain-error doctrine. *People v. Sebby*, 2017 IL 119445, ¶ 50. Defendant must therefore demonstrate plain error under the first prong. We review *de novo* whether the trial court violated Rule 431(b). *People v. Rodriguez*, 2022 IL App (1st) 200315, ¶ 134.

¶ 57    In applying the plain error test, the first step is to determine whether any error occurred. *Thompson*, 238 Ill. 2d at 613. Here, we agree with defendant that although the trial court informed the venire of the four *Zehr* principles, it did not strictly comply with Rule 431(b) because it did not ask four potential jurors if they understood and accepted the fourth principle. See *People v. Wilmington*, 2013 IL 112938, ¶ 32 (trial court violated Rule 431(b) where it did not ask potential jurors whether they understood and accepted the four *Zehr* principles). The State concedes that the trial court failed to comply with Rule 431(b).

¶ 58    Whether evidence is closely balanced under the plain error test is distinct from whether the evidence was sufficient to prove the defendant guilty beyond a reasonable doubt. *Piakowski*, 225 Ill. 2d at 566. "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case," considering "the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Sebby*, 2017 IL 119445, ¶ 53. If a defendant does not show that the evidence is closely balanced, the Rule 431(b) violation is not reversible under the first prong of the plain error test. See, *e.g.*, *People v. Eubanks*, 2021 IL App (1st) 182549, ¶¶ 67, 75; *People v. Hileman*, 2020 IL App (5th) 170481, ¶¶ 39, 45;

¶ 59    Defendant argues that the evidence was, at a minimum, closely balanced because neither side was fanciful or implausible. See *Sebby*, 2017 IL 119445, ¶ 61 (witness testimony for both the State and the defendant had minor inconsistences, but neither side's accounts of the morning's events were fanciful). Defendant argues that there was no physical or forensic evidence tying him to the shooting despite the footwear impressions, beer bottles, bottle caps, latent prints, and cigarette butts found at the scene. He highlights that there were also no eyewitnesses and argues that the State's case depended entirely on whether the jury believed its principal witness with severe credibility issues. Defendant argues that Martin along with all of the other witnesses falsely accused him to obtain benefits from the authorities in their own cases. Defendant maintains that the jury's questions about the investigation demonstrated that it did not necessarily find the State's version of events credible. See *People v. Walker*, 211 Ill. 2d 317, 342 (2004) (jury's notes and questions suggested that it did not find the State's witnesses credible, such that the evidence against the defendant was not as overwhelming as the State argued).

¶ 60    We conclude that the evidence was not closely balanced in this case. Defendant and Jose were in rival gangs. Five distinct witnesses who were previously friends with defendant or associated with him through his gang membership testified that he confessed to them or that they heard him admit in conversations that he went to Jose's house, knocked on Jose's bedroom window, and shot Jose once through the window using a .357 caliber gun, all of which matched the crime scene. Liria testified to additional details regarding Jose watching television and a dog being in his room, which was consistent with other evidence. Defendant ran out of his house when the police arrived to execute a search warrant, and he admitted to the police that on the night of Jose's death, he possessed a "three-five," which was another name for a .357 handgun. The bullet fragments removed from Jose's head came from either a .38 or .357 caliber gun. We further note

that the jury's questions concerned details about the timing and investigation of the case (see *supra* ¶ 30), as opposed to skepticism about witnesses' credibility. As the evidence was not closely balanced, defendant has not shown that the trial court's Rule 431(b) violation constituted plain error.

¶ 61                                    C. Closing Argument

¶ 62    Last, defendant argues that he was denied his right to a fair trial when the prosecution made several improper comments during closing argument. Defendant argues that the prosecutor twice asserted that minutes after Liria learned of the shooting from the police scanner, she heard defendant confess to Antonio. The prosecutor also stated that according to Liria, defendant was wearing all black. Defendant argues that Liria denied any recollection of these events and that the State was unsuccessful in impeaching her with the specific portions of her grand jury testimony.

¶ 63    Defendant further argues that the prosecutor also improperly asserted that defendant told Martin about an argument that he had with Jose and shot him to "settle the score." Defendant contends that this was a misstatement of the evidence because although Martin testified that defendant shot Jose over a general gang dispute, he never testified that defendant and Jose had personally argued.

¶ 64    Defendant argues that the prosecution's most prejudicial error was its repeated statements that witnesses were afraid to testify against defendant. Specifically, the prosecutor stated:

>        "They want to argue that Ritchie Olvera was provided $500 to move his family and
>
>        that is why he provided information. No. No. No. He provided the information long before
>
>        his family was moved with that $500 provided by the FBI.
>
>        Why did they provide that? He was being threatened. The [K]ings were going to
>
>        kill him because he testified in front of the grand jury. They knew it. It is the same with

every witness who came in here. Did they have to worry about retaliation from the [K]ings?

Is that why people are scared? Is that why people said I lied at the grand jury?"

The prosecutor later stated, "They all have gang ties still and they are scared and they all don't

want to testify."

¶ 65    The prosecutor continued with this theme by subsequently stating:

"Of course he's here and he doesn't want to testify. Does anybody want to testify?

I bet most of the police officers don't want to testify. I can guarantee you that Margarita

Covarrubias did not want to testify and neither does any one of them. Especially when

these five civilians have to look out for the Latin Kings. Because now they testified openly

in a court of law and their testimony is going to convict this defendant."

Finally, the prosecutor stated, "Olvera had to be moved by the FBI because he received death

threats. Certainly explains why people are reluctant to testify."

¶ 66    Defendant recognizes that defense counsel did not object to the disputed remarks during

closing argument, thereby failing to preserve the issue for review. See *People v. Enoch*, 122 Ill. 2d

176, 186 (1988). Defendant asks that we review the remarks under the first prong of the plain error

test, which requires a showing that the evidence was closely balanced. *Piatkowski*, 225 Ill. 2d at

564-65. However, we have already considered and rejected the argument that the evidence was

closely balanced. See *supra* ¶ 59.

¶ 67    Defendant alternatively argues that defense counsel was ineffective for failing to object to

the disputed statements. For a claim of ineffective assistance of counsel, a defendant must satisfy

the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Hodges*,

234 Ill. 2d 1, 17 (2009). The defendant must first establish that, despite the strong presumption

that trial counsel acted competently and that the challenged action was the product of sound trial

strategy, counsel's representation fell below an objective standard of reasonableness under prevailing professional norms such that he or she was not functioning as the counsel guaranteed by the sixth amendment. *People v. Manning*, 227 Ill. 2d 403, 416 (2008). Second, the defendant must establish prejudice. *People v. Valdez*, 2016 IL 119860, ¶ 14. In most situations this is done by showing a reasonable probability that the proceeding would have resulted differently absent counsel's errors. *Id.* A failure to establish either prong of the *Strickland* test precludes a finding of ineffectiveness. *People v. Peterson*, 2017 IL 120331, ¶ 79.

¶ 68    Prosecutors generally have wide latitude in the content of their closing arguments and may comment on the evidence and any reasonable inferences from the evidence, even if the inferences reflect negatively on the defendant. *People v. Williams*, 2022 IL 126918, ¶ 44. A prosecutor may also respond to statements by defense counsel that invite a response but must refrain from making improper, prejudicial comments and arguments. *People v. James*, 2021 IL App (1st) 180509, ¶ 39. We view the challenged remarks in the context of the closing argument as a whole. *Jackson*, 2020 IL 124112, ¶ 82. Improper remarks constitute reversible error only if they result in substantial prejudice to the defendant, such that absent the remarks, the verdict would have been different. *People v. Branch*, 2018 IL App (1st) 150026, ¶ 32.

¶ 69    We conclude that defendant cannot satisfy both prongs of the *Strickland* test for the alleged improper remarks. Regarding the statements about Liria, Liria was impeached with her grand jury testimony that Antonio learned from the police scanner that Jose had been shot, and that Antonio called Liria into his room to listen to the scanner. Liria had also previously testified that Antonio and defendant had a conversation about "What had just happened, like how he did it." When questioned at the grand jury about what defendant said in response to Antonio's question of "how he had done it," Liria testified that defendant said that he had walked around Jose's house, got the

dog's attention through a window, and when Jose went to see what the dog was doing, defendant shot him. Accordingly, the prosecutor's statements that Liria heard defendant confess to Antonio were supported by the evidence, such that defense counsel was not ineffective for not objecting to these remarks.

¶ 70    The State acknowledges that it failed to impeach Liria with her grand jury testimony that defendant was wearing black that night, such that the prosecutor should not have commented on the color of defendant's clothing during closing argument. However, this detail was not significant in the State's case against defendant, meaning that defendant cannot satisfy the second prong of the *Strickland* test for this remark; there is no reasonable probability that the trial would have resulted differently had defense counsel objected to that statements about the color of defendant's clothing.

¶ 71    The prosecutor's statement that defendant told Martin that he shot Jose to "settle the score" was within the bounds of reasonable commentary on the evidence, so defense counsel was not ineffective for not objecting to the statement. Martin testified that defendant shot Jose "over a dispute" because "they were in rival groups." Further, Sergeant Gonzalez testified that the Latin Kings and the Maniac Latin Disciples were in a "constant battle *** over anything from the drug trade to territory and recruitment." Gonzalez also testified that the gangs tended to shoot each other out of retaliation. Defendant is correct that there was no evidence that he had personally argued with Jose, but the prosecutor's reference to an argument between the two was brief and isolated, with the result that there is no reasonable probability that an objection from defense counsel would have changed the trial's outcome. See *People v. Bell*, 2021 IL App (1st) 190366, ¶ 104.

¶ 72    The prosecutor's argument that the witnesses were afraid to testify against defendant at trial was supported by the evidence and reasonable inferences from the evidence, and some of the

remarks were further invited by defense counsel. Defense counsel argued in closing that the witnesses could not be believed because they "need[ed] to get out of jail" and "do whatever they had to do." He also stated, "Olvera got out of jail and got $500 from the federal government for what he gave for his information. And what did he say? He heard about it. That's it." In response, the prosecutor argued that the FBI gave Olvera the money because he was being threatened. The parties had stipulated that the FBI paid Olvera $3500 so that he could relocate his family due to threats he allegedly received. Jose's shooting was gang-related and there was testimony about gangs having a code of silence, so it was a reasonable inference that the threats were death threats from the Latin Kings. Many of the witnesses claimed not to recall any conversations in which defendant admitted shooting Jose, contrary to their grand jury testimony, and Liria testified that she lied to the grand jury. It is reasonable to infer that the witnesses' silence at trial was a result of being scared of retaliation from the gang. The prosecutor emphasized that he was inferring their motivations by stating, "Did they have to worry about retaliation from the [K]ings? Is that why people are scared? Is that why people said I lied at the grand jury?" In this manner, the prosecutor highlighted that this was an issue for the jury to resolve for itself, and the statements were within the wide latitude of permissible argument. Accordingly, defense counsel did not act unreasonably in not objecting to these remarks, and defendant's claim of ineffective assistance of counsel fails.

¶ 73                                    III. CONCLUSION

¶ 74    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 75    Affirmed.